Michael S. Fischman (MF 7245)
Elizabeth Adinolfi (EA 3557)
PHILLIPS NIZER LLP
666 Fifth Avenue
New York, New York 10103
(212) 977-9700

Counsel for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK





—————————————————————————— :

LABORATOIRES CARILÈNE S.A.S.,        :

                             Plaintiff,        :    Civil Action No. _____

          v.                           :    **COMPLAINT**

AUGIRA LABORATORIES, INC.,           :

                             Defendant.        :

—————————————————————————— :

      Plaintiff, Laboratoires Carilène S.A.S. ("Carilène"), through its attorneys Phillips Nizer LLP, by way of a complaint against defendant Auriga Laboratories, Inc. ("Auriga"), alleges as follows:

## NATURE OF THE CASE

      1.    This is an action (a) for a breach of a September 13, 2006 license agreement (the "License Agreement") under which Auriga was granted an exclusive license to sell, market, distribute, sublicense and exploit Carilène's patented artificial saliva product, and specifically, Auriga's (i) failure to pay the license payment fee required by Article 5.1 of the License Agreement; (ii) failure to pay Invoices N2006E03047, N2006E03055, N2006E03063 and N2006E3071 for product purchased

1022107.1

from Carilène pursuant to and in accordance with the terms set forth in Articles 5.7, 5.8 and 5.9 of the License Agreement; (b) for a preliminary and permanent injunction to enforce the terms of the License Agreement and to prevent unfair competition by preventing defendant from marketing, selling, distributing or sublicensing the licensed product; and (c) for compensatory, statutory and punitive damages, as applicable, for unfair competition and breach of contract.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(2) because plaintiff and defendant are citizens of different states and the amount in controversy exceeds $75,000, excluding interest and costs.

3.      Venue is proper in this district under 28 U.S.C. § 1391(b).

4.      Upon information and belief, Auriga transacts business in this district in that it has been soliciting business in the district, shipping goods, including product purchased under the License Agreement at issue into the district, selling and deriving substantial revenue from sales in the district and from intrastate and interstate commerce having an effect in this district. In addition, the parties have agreed under Article 10.1 of the License Agreement at issue that "[a]ny legal action or proceeding arising under this Agreement will be brought exclusively in the federal or state courts located in New York City, New York, and the parties herby consent to the personal jurisdiction and venue thereon."

2

## PARTIES

5.      Plaintiff Carilène is a corporation existing under the laws of France, and having its principal place of business at 7, rue du Chant des Oiseaux, 78360 Montesson-France.

6.      Defendant Auriga is a corporation existing under the laws of the State of Delaware, with its principal place of business at 5555 Triangle Parkway, Suite 3000, Norcross, Georgia.  Auriga also maintains an office at 10635 Santa Monica Boulevard, Suite 120, Los Angeles, California.

## ALLEGATIONS COMMON TO ALL CLAIMS

7.      Carilène is the exclusive owner of an invention relating to the treatment of Xerostomia, which is the medical term for the condition of dry mouth created by the lack of saliva.  Individuals with Xerostomia have difficulty in speech and eating, and can suffer from such health issues as swelling of the mouth and mouth ulcers.

8.      The Carilène product that is the subject of the License Agreement is an oral artificial saliva which contains oxygenated triglycerides from corn oil that has necessary lubricating and moisturizing properties for individuals with Xerostomia (hereinafter referred to as the "Product").  The Product is the subject of United States patent number 10/538,835, published under the number US-2006-0078620-A1 on April 13, 2006.

9.      Carilène has obtained all applicable Medical device Rx approvals from the Food and Drug Administration for the Product.

10.      In or about mid-2006, Auriga entered into negotiations with Carilène to become the exclusive distributor of the Product within the United States of America.

3

11.     On or about September 13, 2006, Carilène and Auriga entered into the

License Agreement under which Auriga was granted the "exclusive… right under all

applicable worldwide intellectual property rights, to sell, market, distribute, sublicense

and exploit the Product in the Territory", which is defined in the License Agreement as

the entire United States.  License Agreement, Article 2.1.1.

12.     Article 5 of the License Agreement provides for a non-refundable $1.5

million payment to Carilène, described in the contract as follows:

> **5.1 Payments:**  In consideration of the exclusive license
> granted under Article 2.1, thirty (30) days prior to shipment
> of the first batch of Product ordered by Buyer hereunder,
> Buyer shall pay to Supplier a non-refundable premium of
> U.S.D. $1.5 million in accordance with the following
> payment schedule:
>
> > (i).  U.S. $250,000 upon the commercial launch of
> > the Product in the U.S.;
> >
> > (ii).  U.S. $500,000 on or before the 90th day after
> > commercial launch of the Product in the U.S.; and
> >
> > (iii).  U.S. $750,000 upon the earlier of 12-months
> > after the commercial launch of the Product or at the
> > time that Buyer achieves $5 million of net sales.
> > (referred to herein as "License Payment Premium")

13.     The Product was commercially launched by Auriga in February, 2007,

under the name "Aquoral" (see pages from Auriga website at Exhibit A hereto), and over

100,000 units of the Product have been shipped by Carilène to Auriga.

14.     Upon information and belief, thousands of prescriptions for the Product

are being filled in the United States each months.

15.     By agreement between the parties, Auriga made the $250,000 License

Payment Premium due under Article 5.1(i) upon execution of the License Agreement,

and Carilène agreed to accept the $500,000 payments due under Article 5.1 (ii) in two

4

equal installments, the first due on or about July 1, 2007, and second on or about
November 1, 2007.

16.     Notwithstanding that all necessary conditions have been met, Auriga has
failed to make any part of the payment due under Article 5.1(ii), and has expressed a
clear, unequivocal refusal to make any of the payments required under Article 5.1(ii) and
(iii), which totals $1,250,000.

17.     Pursuant to Article 2.2.1 of the License Agreement, Auriga also agreed to
purchase from Carilène "all of its requirements for the Product in accordance with the
terms of this Agreement."

18.     In order for Auriga to maintain exclusive distribution rights under the
License Agreement, it is obligated under Article 5.9 to purchase certain minimum
amounts of the Product from Carilène during the term of the Agreement.  The minimum
requirements for the first 12 month period is "at least 50,000 units".  License Agreement,
Article 5.9.1,

19.     With respect to the Product purchased by Auriga from Carilène under the
License Agreement, it was agreed in Article 5.7 that Auriga "shall be invoiced for the
purchase of the Product with a payment term of 30 days from evidence of shipment."  It
is further agreed that "[a]ll invoices shall be paid by [Auriga] within thirty (30) days of
receipt by bank transfer only."

20.     Carilène has shipped over 100,000 units of the Product, as well as related
material, and has issued the following invoices each of which is now past due (as
reflected on the face of the invoices and as calculated pursuant to License Agreement,
Article 5.7):

5

| Invoice No. | Amount |
|---|---|
| N2006E0304 | $561,078.00 |
| N2006E03055 | 41,662.35 |
| N2006E03063 | 2,641.85 |
| N2006E03071 | 1,467.96 |
| | $606,850.16 (the "Invoice Debt") |

21.    On September 7 and 17, 2007, Auriga made partial payments to Carilène on the Invoice Debt totaling $70,000, thereby leaving an unpaid balance of $556,850.16.

22.    Pursuant to License Agreement Article 7.2.2 (under Article 7, titled "Term and Termination"), "[e]ither party may terminate this Agreement by giving notice in writing to the other party in the event the other party is in material breach of a material provision [of] this Agreement and such breaching party shall have failed to correct such breach within thirty (30) days of receipt from the other party of written notice describing with specificity such breach (and if such breach is not reasonably corrected within thirty (30) days, such breaching party much have at least undertaken within thirty (30) reasonable steps to correct such breach after such 30-day period in order to prevent such termination.

23.    By letter dated September 25, 2007, Carilène, through counsel, notified Auriga of its defaults under the material obligations of Articles 5.1, 5.3 and 5.7 of the License Agreement.  Quoting the letter, a copy of which is annexed hereto as Exhibit B:

> Specifically, Auriga Laboratories, Inc. has (i) failed to pay
> in full the license payment required by Article 5.1 in the
> amount $250,000 in July 2007 ...; and (iii) failed to pay in
> full in accordance with the terms set forth in Article 5.8 its
> purchase order no. 79 [invoice N2006E0304]and invoices
> N2006E03055, N2006E03063 and N2006E3071.

24.    Auriga did not cure these defaults, and instead, by letter dated October 16, 2007, actually claimed that Carilène is in default under the License Agreement and announced its outright refusal to make any payments required thereunder, including

6

payments for the License Payment Debt and the Invoice Debt. A copy of the letter from Auriga dated October 16, 2007, is annexed hereto as Exhibit C.

25.     By letter dated October 19, 2007 (Exhibit D hereto), Carilène terminated the Agreement, demanded return of all Product that had not been paid for in full, as well as the return of all confidential information provided to Auriga under the License Agreement.

26.     Auriga has refused to cure the breaches set forth in the notice of default, and upon information and belief, continues to sell, promote, distribute and market the Product.

27.     Pursuant to Article 5.3 of the License Agreement, Auriga is required to pay royalties "equal to five percent (5%) on Net Sales." Article 5.3 further provides that royalties are to be "calculated for the first six months after initial distribution by Buyer [Auriga] and every six months thereafter. Royalty is to be paid 60 days following the determination period to Supplier [Carilène]."

28.     Upon information and belief, royalties have been earned on sales through termination of the License Agreement on October 19, 2007, which have not been accounted for by Auriga or paid to Carilène.

### FIRST CLAIM
### (Unfair Competition)

29.     Plaintiff repeats and incorporates all prior allegations.

30.     Plaintiff validly terminated the Agreement.

31.     Cariléne has demanded that Auriga cease all promotion, sale and distribution of the Product, but, upon information and belief, Auriga has failed to comply

7

with Cariléne's demand and continue to promote, sell and distribute the Product throughout the United States.

32.    Auriga has engaged and continues to engage in unfair competition by continuing to promote, market, sell and distribute the Product to which it has no rights and for which it is not a licensee.

33.    The aforesaid acts of Auriga of distributing, promoting, advertising, offering for sale and selling the Product constitute inequitable conduct and unfair competition, and are likely to deceive and confuse customers into believing that the Product is licensed by or otherwise associated with Cariléne.

34.    Auriga's acts constitute misappropriation of the Cariléne Product and the good will and reputation which are associated therewith.

35.    Such unfair competition completely disregards Cariléne's rights and is willful.

36.    Cariléne has suffered and will continue to suffer substantial damages as a result of this unfair competition.

### SECOND CLAIM
### (Unjust Enrichment)

37.    Cariléne repeats and incorporates all prior allegations.

38.    By virtue of selling and distributing the Product following termination of the License Agreement, Auriga has been unjustly enriched at the expense of Cariléne.

39.    Equity and good conscience compel that Auriga make restitution to Cariléne of the profits it has earned on the sale and distribution of the Product in violation of the License Agreement in an amount to be determined at trial.

8

### THIRD CLAIM
### (Breach of Contract -- The Invoice Debt)

40.     Cariléne repeats and incorporates all prior allegations.

41.     During the term of the Agreement, Auriga has purchased Product and issued invoices totaling $606,850.16, representing the Invoice Debt as described herein.

42.     Auriga accepted delivery of the Product and, upon information and belief, has sold the Product to individuals nationwide, and continues to market, promote, distribute and sell the Product purchased from Cariléne for which payment is sought herein.

43.     Auriga has made partial payments of the Invoice Debt on September 7, 2007 and September 17, 2007, in the sum total of $70,000.

44.     Auriga's acceptance, payment and resale of the Product represent acts of acceptance under Article 2 of New York's Uniform Commercial Code.

45.     Failure to make payments due on the Invoice Debt, pursuant to Article 5.7 of the License Agreement, is a material breach of the agreement.

46.     Auriga is indebted to Cariléne for the Invoice Debt in the sum total of $556,850.16, exclusive of interest.

### FOURTH CLAIM
### (Breach of Contract -- License Payment Premium)

47.     Plaintiff repeats and incorporates all prior allegations.

48.     Pursuant to Article 5  the Agreement, Auriga was required to make a non-refundable License Payment Premium of  $1,250,000, in three installments the first of which was due and unpaid.

9

49.     Failure to pay the License Payment Premium when due is a material breach of the License Agreement.

50.     Auriga is indebted to Cariléne for the License Payment Premium in the sum of $1,250,000, exclusive of interest.

### FIFTH CLAIM
### (Breach of Contract/Accounting -- Royalty Obligations)

51.     Plaintiff repeats and incorporates all prior allegations.

52.     By virtue of selling, marketing and distributing the Product through and including October 19, 2007, royalties have been earned pursuant to Article 5.3 of the License Agreement.

53.     Failure to pay the royalties due for pre-termination sales would allow Auriga to be unjustly enriched at the expense of Cariléne.

54.     Cariléne is without knowledge of orders received by Auriga for the Product, sales made by Auriga through and including October 19, 2007, or the amount of royalties due to Cariléne under the License Agreement, and cannot independently obtain such knowledge or ascertain those amounts.

55.     By reason of the foregoing, Auriga is indebted to Cariléne for money had and received by Auriga, a percentage of which is due Cariléne, all to Cariléne's damage in a sum as yet undetermined.

56.     Pursuant to the License Agreement, Auriga must account for and pay all royalties due and owing under the License Agreement as of the date of termination.

**WHEREFORE**, *plaintiffs respectfully requests that this Court enter judgment:*

1022107.1

1.      On the first and second claims (i) granting a preliminary and permanent injunction enjoining a defendant from any further promotion, marketing, sale and distribution of the Product, (ii) awarding compensatory damages against defendant, plus costs of suit, interest and any attorneys' fees allowed by law resulting from their unauthorized promotion and sale of the Product, (iii) ordering disgorgement of all profits earned by defendant; and (iv) awarding punitive damages.

2.      On the third and fourth claims, for compensatory damages for breach of contract against defendant in the sum of $1,806,850.16, plus interest.

3.      On the fifth claim, ordering an accounting and awarding damages in the amount of all unpaid royalties due under the License Agreement.

4.      On all claims, for such other and further relief as this Court may deem just and proper under the circumstances.

### DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury of all issues so triable.


Dated: New York, New York
October 25, 2007

PHILLIPS NIZER LLP

By: _____
    Michael S. Fischman (MF 7245)
    666 Fifth Avenue
    New York, New York 10103-0084
    (212) 977-9700

    *Counsel for Plaintiff Laboratoires*
    *Carilène S.A.S.*

11

Exhibit A

For Healthcare Professionals

Home |

# aquoral™ artificial saliva



80%

HELP IS JUST A SPRAY AWAY

According to a recent poll of Dentists conducted by the Academy of General Dentistry, more that... complain... of Dry Mouth and Dry M... informs pe... wee...

## Xerostomia or Dry Mouth isn't just an inconvenience.

Dry Mouth is more common than you might think. Millions of people suffer from Dry Mouth, also known as Xerostomia, which is the feeling of a lack of saliva. Saliva plays a very important role in maintaining the overall health of the mouth because it helps to kill bacteria. The lack of saliva can lead to painful swelling of the mouth and mouth ulcers.

## Aquoral is innovation in oral hydration™

Aquoral is a clinically proven innovation in the treatment of Dry Mouth. Aquoral's novel formulation is based on Oxidized Glycerol Triesters, an oxygen-enriched, plant-derived lipid. When used as directed Aquoral not only soothes but helps heal the symptoms commonly associated with Dry Mouth.

Patient Rebate  $25

## How do I know if have Xerostomia (Dry Mouth)?

If you are suffering from any or all of symptoms below, Aquoral might be r for you.

• Saliva that seems thick, stringy
• Sores or split skin at the corners o your mouth
• Bad breath
• Difficulty speaking, swallowing
• A burning or tingling sensation of your tongue
• An altered sense of taste



**Auriga**

Our Business is Your Health™

ORPORATE PROFILE    OUR BUSINESS    OUR PRODUCTS    INVESTORS    FOR PHYSICIANS    CAREERS    CONTACT

DRATE PROFILE

GEMENT TEAM

D OF DIRECTORS

FORCE

**CORPORATE PROFILE**



**Auriga Milestones:**

- Company Founded – April 2005
- Licensed Extendryl® Product Line - May 2005
- Auriga begins trading under the ticker symbol ARGA on OTC stock exchange - July 2006
- *Implementation of Commission-Only Sales Model – August 2006*
- Licensed Levall® Product Line - September 2006
- Launch of Aquoral™ – February 2007
- Launch of Zinx™ – February 2007
- Sales force size reaches 200 representatives – March 2007

Corporate Profile | Our Business | Our Products | Investors | For Physicians | Careers | Contact | Home

Use of this website is governed by our Terms of Use and Privacy Policy. © 2007 Auriga Labs, Inc.

Exhibit B

# PHILLIPS NIZER LLP

666 Fifth Avenue
New York, NY 10103-0084
212.977.9700
Fax 212.262.5152

600 Old Country Road
Garden City, NY 11530-2011
516.229.9400
Fax 516.228.9612

**Stephen D. Kramer**
212.841.0581
skramer@phillipsnizer.com

45 Essex Street
Hackensack, NJ 07601
201.646.1664
Fax 201.646.1764

www.phillipsnizer.com

September 25, 2007

**By Federal Express and E-mail**

Auriga Laboratories, Inc.
Attention: Mr. Philip S. Pesin, Chief Executive Officer
10635 Santa Monica Blvd. #120
Los Angeles, CA 90025

Re:    Licensing and Supply Agreement with Laboratoires Carilène S.A.S.

Dear Mr. Pesin:

This firm is United States counsel to Laboratoires Carilène S.A.S. Reference is made to that certain Licensing and Supply Agreement dated September 13, 2006 between Auriga Laboratories, Inc. and Laboratoires Carilène S.A.S. (the "Agreement").

This letter constitutes notice of default by Auriga Laboratories, Inc. of its material obligations under Sections 5.1, 5.3 and 5.7 of the Agreement. Specifically, Auriga Laboratories, Inc. has (i) failed to pay in full the license payment required by Section 5.1 in the amount of $250,000 due July, 2007 as the same was modified between the parties from the original contractual term; (ii) failed to pay royalties for the first six months of 2007 as required by Section 5.3; and (iii) failed to pay in full in accordance with the terms set forth in Section 5.8 its purchase order no. 79 and invoices N2006E03055, N2006E03063 and 258345. Laboratoires Carilène S.A.S. reserves the right to assert additional defaults under the Agreement which may have occurred or may occur.

Please be advised that should Auriga Laboratories, Inc. not cure its defaults under the referenced provisions of the Agreement within thirty (30) days of receipt of this notice, then Laboratoires Carilène S.A.S. reserves its right to terminate the Agreement further to Section 7.2.8 together with all such other rights as it may have under the Agreement and at law.

1019306.1

PHILLIPS NIZER LLP

Auriga Laboratories, Inc.
September 25, 2007
Page 2


        Please govern yourselves accordingly.

                                        Very truly yours,

                                        *Stephen D. Kramer*

                                        Stephen D. Kramer

SDK:sdk

cc:     Auriga Laboratories, Inc.
        5555 Triangle Parkway, Suite 300
        Norcross, Georgia 30092

        Laboratoires Carilène S.A.S.
        A l'attention de Mme. Caroline Desjonqueres, General Manager
        7, rue de Chant des Oiseaux
        78360 Montesson
        FRANCE

        Me. Alain Pireddu
        72, Boulevard Malesherbes
        75008 Paris
        FRANCE

1019306.1

Exhibit C



AURIGA LABORATORIES, INC.
10635 SANTA MONICA BLVD. #120
LOS ANGELES, CA 90025

October 16, 2007

**Caroline Desjonqueres**                                              **Via Fax & Overnight Delivery**
Laboratoires Carilene SAS
7 rue du Chant de Oiseaux
Montesson-France 78360

**RE:**   **Notice of breach of license agreement**

Dear Ms. Desjonqueres:

Auriga Laboratories, Inc. ("Auriga") hereby provides notice of breach of that certain license agreement between Auriga and Laboratoires Carilene ("Carilene") dated September 13, 2006 (the "License"). Auriga provides notice for the following breaches:

1)    **Minimum Batch Size.** Section 5.2 of the License provides that the minimum batch size for stock bottles of the Product shall be 100,000 units deliverable in 2 shipments. Auriga placed an initial order for a delivery of the first 50,000 unit delivery. When Auriga attempted to arrange for the second delivered shipment of 50,000 units to represent the first 100,000 unit minimum order, Auriga was told by Carilene that it was required under the contract to place a minimum order of 100,000 units. Based upon this misrepresentation and Auriga's need to assure it had timely delivery of products, it placed this 100,000 unit order, despite its clear violation of the License. Auriga should not be responsible for any financial obligations arising from the additional 50,000 units that were improperly ordered.

2)    **Lead Time.** Section 4.2.1 of the License provides that the lead time for products ordered shall be 12 weeks for the first order and 8 weeks for all further orders. Auriga's first order of product was not received by air-freight until approximately March 1, 2007, which was 20 weeks after it placed its order. This delay caused Auriga to delay the potential launch of the product. In addition, seeing the delayed delivery time for the first order, Auriga did not have confidence that it would receive any further shipments within 8 weeks and was forced to place another order pre-maturely well in advance of when it even may need the product.

3)  **Commercial Launch.**  In order for Auriga to commercially launch the product, it required product samples to be distributed, which were promised by Carilene. Carilene failed to ever procure or provide commercially viable product samples to Auriga, so it has never been able to actually commercially launch the product. As the payments and royalties of Sections 5.1 and 5.3 are calculated after the commercial launch, those payments and royalties are not yet due and payable. In fact, Auriga made one such payment and would be entitled to a credit for this prior payment.

4)  **Royalty Payment Timeline.**  Section 5.3 of the License provides that Auriga will pay royalties which are to be calculated for the first six months after initial distribution by Auriga and the royalty is not due until 60 days following the determination period. Although Auriga contends that it has never commercially launched the product, if the initial distribution was March 1, 2007 when it received the product, the 6 month determination period would run through September 1, 2007 and the first payment would not be due until November 1, 2007. Therefore, Auriga does not owe any royalties at this time, despite your contentions to the contrary. Auriga plans to recalculate the net sales under GAAP accounting and will provide you with such calculation when our return reserve analysis is complete.

5)  **Manufacturing Rights.**  Section 4.3 of the License provides that if Carilene admits in writing its inability to pay or enters into an arrangement for the benefit of creditors under circumstances in which it is unable to meet its obligations as they fall due, Auriga has the non-exclusive right and license to use the Manufacturing Package and to select a third party to manufacture further orders of the product. According to statements made by representatives of Carilene regarding its inability to pay creditors and its attempts to make an advance payment arrangement with Auriga due to obligations it could not fulfill with its suppliers, Auriga believes that Carilene is insolvent and unable to pay its creditors. As such, Auriga hereby demands that the Manufacturing Package be placed in escrow and Auriga will continue to have a non-exclusive right to use the Manufacturing Package. We hereby demand the name of at least 3 mutually agreeable escrow agents within 10 days of this notice.

Auriga withdraws any prior offers in compromise at this time and does not feel that it owes any further moneys beyond what it has paid at this time. Auriga further demands that we be provided with at least 3 potential escrow agents that Carilene would be agreeable to for use as the escrow agent to hold the Manufacturing Package.

Very Truly Yours,

Philip S. Pesin
Chief Executive Officer

Exhibit D

# PHILLIPS NIZER LLP

666 Fifth Avenue
New York, NY 10103-0084
212.977.9700
Fax 212.262.5152

600 Old Country Road
Garden City, NY 11530-2011
516.229.9400
Fax 516.228.9612

**Stephen D. Kramer**
212.841.0581
skramer@phillipsnizer.com

45 Essex Street
Hackensack, NJ 07601
201.646.1654
Fax 201.646.1764

www.phillipsnizer.com

October 19, 2007

**By Federal Express and E-mail**

Auriga Laboratories, Inc.
Attention:  Mr. Philip S. Pesin, Chief Executive Officer
10635 Santa Monica Blvd. #120
Los Angeles, CA 90025

Re:    Licensing and Supply Agreement dated September 13, 2006 with Laboratoires
       Carilene S.A.S. (the "Agreement")

Dear Mr. Pesin:

Laboratoires Carilène SAS ("Carilène") acknowledges receipt from Auriga Laboratories, Inc. ("Auriga") of a notice of breach dated October 16, 2007 (the "Notice") with respect to the above-referenced Agreement.  The Notice is nothing more than a blatant attempt by Auriga to avoid the clear and unambiguous financial obligations for which it contracted under the Agreement.

To the extent any breach is alleged in the Notice, Carilène categorically denies the same.  Carilène does not consider it necessary to detail the basis for its denial of each point except to aver that it is in possession of documentary evidence sufficient to refute each and every allegation of the Notice.

As regards Auriga's demand for identification of escrow agents for deposit of the Manufacturing Package, Carilène hereby confirms that it has never admitted in writing its "inability to pay its debts generally as they come due", nor has it taken any other measure that would constitute an act of insolvency as required under Section 4.3 of the Agreement.  My client takes special offense at the disingenuous exploitation of Auriga's failure to pay Carilène for its purchases of Product to justify manufacture of the unpaid Product by a third party.  Furthermore, you are well aware of the restrictions upon use of positions taken during settlement negotiations.  Auriga's spurious demand is refused as it has no credible basis.

1022035.1

PHILLIPS NIZER LLP

Auriga Laboratories, Inc.
September 25, 2007
Page 2

As the Notice constitutes a clear anticipatory repudiation of the Agreement, Carilène considers that the 30-day cure period following notice of default as provided in Section 7.2.2 is no longer applicable. Therefore, please be advised that Carilène hereby terminates the Agreement effective immediately.

In that Auriga has made clear in the Notice that it has no intention of performing under the Agreement, the right to continue to sell inventories of Product set forth in Section 7.4 is terminated, and Carilène demands the immediate return by air shipment of all Product that has not been paid in full. Any further proceeds of the sale of Product by Auriga is deemed to constitute unjust enrichment at the expense of Carilène, and all proceeds are to be held in trust for my client.

As required by the Agreement, you are directed to return to Carilène all copies of its confidential information in your possession in whatsoever form and on whatsoever media, and you are no longer to hold yourselves out as the exclusive licensee or authorized distributor of the Product, as such term is defined in the Agreement. All use of Carilène's trademark is to cease immediately.

While Carilène is aware that any goodwill associated with such trademarks as may have been developed by Auriga for use in relation to the Product belongs to Auriga, you are hereby directed not to use any such trademarks in connection with any product that is not the Product in order to avoid confusion as to source, as required under US law.

Carilène maintains its rights and remedies, both contractual and legal, in respect of Auriga's continuing breaches of the Agreement. Nothing in this notice of termination shall be construed to waive or modify those rights. Please be advised that Auriga will continue to accrue royalty obligations to Carilène under the Agreement to the extent that there are any continuing sales of existing inventories of the Product.

Carilène relies upon Auriga to comply with such other legal obligations arising out of this notice of termination as may be applicable and otherwise to govern yourselves accordingly.

Very truly yours,

Stephen D. Kramer

SDK:sdk

1022035.1

PHILLIPS NIZER LLP

Auriga Laboratories, Inc.
September 25, 2007
Page 3

cc:    Auriga Laboratories, Inc.
       5555 Triangle Parkway, Suite 300
       Norcross, Georgia 30092

       Laboratoires Carilène S.A.S.
       A l'attention de Mme. Caroline Desjonqueres, General Manager
       7, rue de Chant des Oiseaux
       78360 Montesson
       FRANCE

       Me. Alain Pireddu
       72, Boulevard Malesherbes
       75008 Paris
       FRANCE

1022035.1